# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of:<br><br>A black Samsung smart phone, currently in evidence at the Milwaukee Police Department under MPD Inventory #18014929, Item #14. | )<br>)<br>) Case No. 18-849 (NJ)<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 2119(1); and Title 18, United States Code, Sections 924(c).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO William Sheehan, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: June 5, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, William Sheehan, being first duly sworn on oath, on information and belief state:

I. **BACKGROUND, TRAINING, AND EXPERIENCE:**

1. I have been a detective with the Milwaukee Police Department over 19 years. I am currently assigned to the FBI's Violent Crime Task Force as a federally deputized Task Force Officer. During my career in law enforcement, I have participated in violent crime investigations, including armed robberies, carjackings, kidnappings, extortions, murder for hire, bank and armored car robberies.

2. Based on my training and experience, I believe there is probable cause that UDELL L. PUGH (DOB XX/XX/1999) committed the motor vehicle robbery (carjacking) of D.H. on April 21, 2018, in violation of Title 18, United States Code, Section 2119(1) (Motor Vehicle Robbery), and used a firearm during a crime of violence, in violation of Title 18, United States Code, Section 924(c).

3. This affidavit is based upon my personal knowledge and information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is based upon information provided by other law enforcement officers' police reports, citizen witnesses' statements, surveillance footage, post-arrest statements, and other information whose reliability is established separately herein.

4. This affidavit is submitted in support of an application for a search warrant for the following portable electronic device ("Device"), which is currently in custody at the Milwaukee Police Department, for evidence of the aforementioned crimes:

   a. A black Samsung smart phone, currently in evidence under MPD Inventory #18014929, Item #14.

5. Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have attempted to set forth only the facts that I believe are pertinent to establishing the necessary foundation for the requested warrant.

## II. PROBABLE CAUSE

6. On April 21, 2018, at approximately 11:50 a.m., D.H. was robbed of her black 2005 Mazda 3 with license plate MV 1585. This vehicle had previously been transported in interstate commerce. D.H. told officers that she had driven to 6141 W. Appleton Avenue to meet with a woman to purchase a wig. D.H. parked in the alley behind the location to wait for the woman. While D.H. waited in her Mazda, a young black male approached D.H. and asked to use D.H.'s phone. D.H. told the suspect "no." The suspect then produced a dark-colored revolver from his hooded sweatshirt pocket and pointed it at D.H. The suspect said, "Bitch, get out or I am going to shoot you!" D.H. exited the car and the suspect got into the driver's seat. D.H. ran around the car, opened the passenger door, and pleaded with the suspect not to take her car. The suspect placed the car in reverse, accelerated, and struck an SUV and a utility pole. While the suspect did this, D.H. was partially on the passenger seat and was thrown from the vehicle and knocked to the ground. The suspect placed the vehicle into drive and fled from the alley. D.H. saw the suspect drive eastbound on W. Appleton Avenue. D.H. flagged down a police officer on a motorcycle and told him what happened.

7. A witness, S.V. saw the carjacking. S.V. saw a black female (D.H.) on the passenger side of a dark-colored vehicle. He saw the car back up, striking an SUV and a utility pole. According to S.V., it appeared that the driver was trying to hit the black female with the car.

2

When the car struck the utility pole, S.V. saw the female get catapulted from the car. The car then drove eastbound on Appleton.

8. Soon after the carjacking, officers were dispatched to St. Joseph's Hospital regarding another strong armed robbery complaint. The "victim" was Udell Pugh. Pugh had sustained a very serious injury to his left ankle and was being treated at St. Joseph's Hospital and then at Froedtert Hospital. Security personnel alerted officers that Pugh had arrived as the driver and sole occupant of a black Mazda 3 with license plate MV 1585, D.H.'s stolen car. St. Joseph's Hospital is about 0.7 mile from the carjacking location.

9. The hospital surveillance footage reflected that at approximately 11:54 a.m., about four minutes after the carjacking, Pugh arrived at the hospital, driving D.H.'s stolen Mazda. He entered the parking lot from the west. In the footage, the driver's door is open as the vehicle speeds through the parking lot. Pugh, the only occupant, left the car running near the entrance doors and limped into the hospital. Pugh was wearing a black hooded sweatshirt/jacket, a black winter hat, blue jeans, consistent with D.H.'s description of the suspect's clothing. Upon examining the vehicle, officers noticed that the door was wedged open due to some type of collision, consistent with Pugh's collision with the pole in the alley after robbing D.H. of the car. Officers recovered a Smith & Wesson (dark-colored) .32 caliber revolver (with serial # 172458) on the front passenger seat of the vehicle. The revolver was loaded with five rounds of ammunition.

10. In addition to Pugh's clothing items, officers also recovered a cell phone from Pugh's belongings. The cell phone is further described as a black Samsung smart phone. The phone was seized and placed in Milwaukee Police Department evidence under Inventory #18014929, Item #14.

3

11.     Pugh provided multiple different versions of the "armed robbery" of which he claimed to be the victim. Essentially, he claimed that around 12:00 or 12:15 (he was unsure of time) he was waiting for a bus on either the 4400 or 4500 block of Burleigh. He did not remember which side of the street or which direction he intended to travel. While waiting for the bus, three suspects robbed him. One had a rifle and the other two had handguns. They dragged him into the back seat of a Mazda. At some point during the encounter, his foot hit the back seat door frame causing the deep avulsion. Pugh stated he was bleeding in the back seat. The driver then drove off with Pugh and another suspect in the back seat. From the back seat, Pugh bit the driver, the driver stopped the car, and all three suspects exited the car. Pugh then moved from the rear of the car to the driver's seat and drove himself to the hospital. Pugh did not know exactly where he was when he switched spots in the car or which direction he took to get to the hospital. Pugh admitted he had a phone on him, but couldn't explain why he didn't call 911.

12.     Pugh's version of events contradicted the evidence recovered and observed by officers during the investigation. First, the back seat of the Mazda had so much stuff in it that it would be impossible for two people to fit and there was no evidence of a struggle in the back seat. There was blood on the left side of the driver's seat and on the frame around the driver door, but no blood anywhere else in the car. The car had extensive damage to the driver's side door, door frame, and front quarter panel. The damage was consistent with the suspect backing the car into a telephone pole while the door was still open. There was also damage to the front passenger door consistent with the suspect hitting a parked car as he was fleeing from the carjacking scene.

13.     A couple hours after the carjacking, D.H. was shown a photo line-up that included a photo of Udell Pugh. D.H. identified Pugh as the man who carjacked her.

4

## III. TECHNICAL TERMS

14. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

5

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

## IV. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15. Based on my knowledge, training, and experience, as well as my conversations with other Special Agents of the Federal Bureau of Investigation, who are experienced with electronic communication systems, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Devices. This information can sometimes be recovered with forensics tools.

16. *Forensic evidence.* As further described in Attachment B, this applications seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of use, who used it, and when.

17. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

18.  *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is a reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.  CONCLUSION

19.  Based upon the foregoing, there is probable cause to believe that evidence related to the carjacking of D.H. will be recovered from the Device, to potentially include the phone's assigned telephone number and the phone's travel (through GPS information) before, during, and just after the carjacking.

# ATTACHEMNT A

The following property is to be searched:

a. A black Samsung smart phone, currently in evidence under MPD Inventory #18014929, Item #14.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

8

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of Title 18, United States Code, Section 2119(1) (motor vehicle robbery); and Title 18, United States Code, Section 924(c) (Use of Firearm during Crime of Violence) involving Udell Pugh, which was in active memory of the Device as of April 21, 2018, to include:

   a. any information related to possession of firearms (including photographs, text messages, emails, or any other communication information);

   b. any information recording any targets' schedule or travel in April 21, 2018;

   c. any web search information related to the offenses described above;

   d. photographs of any location evidencing pre-robbery surveillance;

   e. any communications via text messages, email, Facebook, Twitter, or other web-based applications between the subject and others regarding the offenses described above; and

   f. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.

9